UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| EVANSVILLE MARINE SERVICE, INC., as Owner of the M/V Loyd C., Official No. 631013 for Exoneration from or Limitation of Liability, | ) ) ) ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00152-RLY-CSW |
| | ) | |
| CHRISTOPHER J. THURBY, | ) | |
| | ) | |
| Claimant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Petitioner Evansville Marine Service, Inc. is the owner of the M/V Loyd C., a vessel on which Claimant Christopher J. Thurby was injured on January 2, 2020.  On May 1, 2020, Thurby filed a complaint against Evansville Marine in this court.  *See Thurby v. Evansville Marine Service, Inc.*, No. 3:20-cv-104.  On July 6, 2020, Evansville Marine filed the present petition for exoneration from or limitation of liability under Rule F of the supplemental rules for certain admiralty and maritime claims.  (*See* Filing No. 1); *see also* 46 U.S.C. § 30501 *et seq*.  Thurby filed his answer to Evansville Marine's petition on September 9, 2020, and asserted counterclaims for Jones Act negligence and for unseaworthiness under general maritime law.

This case came before the court in a bench trial on April 17 and 18, 2023, for Evansville Marine's petition for exoneration or limitation and Thurby's counterclaims.

1

After considering the evidence therefrom, the court now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

**A.     The Parties**

1.     Evansville Marine is an Indiana corporation with its principal place of business in Evansville, Indiana.  (Filing No. 13 ¶ 3; Filing No. 17 ¶ 3).

2.     Evansville Marine is a marine services company that performs barge fleeting, shifting, and spotting on the Ohio River.  (Tr. at 66, 299).[1]

3.     At all relevant times, Evansville Marine owned and operated the M/V Loyd C., which is an inland river commercial towing vessel, operated on the navigable waters of the United States of America.  (Filing No. 87, Stipulation ¶ 4; Tr. at 301).

4.     At all relevant times, Evansville Marine employed M/V Loyd C. crew members Captain Charles Todd Thurman and Deckhand Christopher J. Thurby.  (Filing No. 87, Stipulation ¶¶ 1, 6).

5.     Thurby is a resident of Livermore, Kentucky.  (Tr. at 132–33).

6.     Thurby graduated from Owensboro High School in 2005.  (Filing No. 91, Thurby Dep. at 7).

7.     Evansville Marine hired Thurby to work as a deckhand in 2019.  (Tr. at 133, 299).

---

[1] The trial transcript, notated throughout these findings of fact and conclusions of law as "Tr.," is divided into two consecutively paginated docket entries.  (*See* Filing Nos. 156, 158).  Given the pagination is continuous, the court cites only to the page of the trial transcript.

8.    Prior to his service as a deckhand with Evansville Marine, Thurby worked as a deckhand for Mt. Vernon Barge for about one year.  (Tr. at 133–34).

9.    Thurby's duties during his work for Mt. Vernon Barge included mooring barges to docks.  (Tr. at 134).

10.   From that experience, Thurby also understood that he should allow a barge to settle out—or stop moving—before attempting to tie off the barge where possible. (Tr. at 172–73).  This was "common sense."  (*Id.* at 172).

11.   At the time of the incident, Thurby was 32 years old; he was 36 years old at the time of trial.  (Tr. at 132).

12.   Thurby is right-handed.  (Tr. at 219–20).

**B.    The Dock**

13.   At all relevant times, Owensboro Grain owned the Owensboro Refinery Dock located near mile 758.1 on the Kentucky bank of the Ohio River.  (Tr. at 75).

14.   This dock was distinct from another dock owned by Owensboro Grain called the Owensboro Grainery Dock.  (Tr. at 195–96).

15.   Owensboro Grain hired Evansville Marine to deliver empty barges to its docks, including the Refinery Dock, and to remove barges from the dock after loading. (Tr. at 25, 319–20).

16.   The Refinery Dock consists of three vertical I-beam posts connected by horizontal I-beams, which were 11 feet and 3 inches apart.  (Tr. at 77; Thurby Exs. 6-199, 6-200).

17.    The following is an accurate picture of the Refinery Dock.  The O-rings are on the left and flush against the vertical I-beams.  The two kevels are on the horizontal I-beams.  The Ohio river flows from left (upstream) to right (downstream):



18.    An I-beam consists of three pieces and is shaped like an I.  (*See* EMS Ex. 12-8). There are two "flanges" which consist of the top and bottom of an I as well as one "web," which is the vertical part of an I.  (*See id.*).

19.    Each horizontal I-beam contained two kevels—a strong T-shaped object that is usually used to tie vessels to docks.  (EMS Ex. 12-8).  As the kevels were on each horizontal I-beam, they were vertically spaced at 11 feet and 3 inches apart.

(Thurby Ex. 6-199).  The two kevels were horizontally spaced on each side of the center vertical I-beam.  (EMS Ex. 12-8).

20.    The dock also had O-rings, which were used for tying off a barge.[2]  (Tr. at 141). O-rings are heavy objects.  (Tr. at 197).

21.    As shown in the picture above, the O-rings were attached to the inside of the I-beam that sat upstream and were flush against the flanges of the I-beams.  (*See* EMS Ex. 12-8).

22.    Each O-ring was vertically spaced 11 feet and 3 inches apart.  (Tr. at 76–77, 291).

23.    Near the water line and wrapped along the outside of the upstream I-beam farthest toward the river was a steel reinforcement plate that Thurby refered to as the "bumper."  (Tr. at 280; EMS Ex. 12-8).

**C.    Thurby's Employment and Training with Evansville Marine**

24.    Evansville Marine hired Thurby to work as a deckhand on July 29, 2019.  (Tr. at 133, 135, 299; EMS Ex. 6-1).

25.    Thurby was regularly assigned to the M/V Loyd C. as a deckhand and was serving in that position on January 2, 2020.  (Tr. at 144, 300).

26.    Evansville Marine required Thurby to complete a new orientation program which consisted of videos and workbook materials discussing company safety rules,

---

[2] The parties have variously referred to these mooring rings as "O" or "D" rings.  (*Compare* Tr. at 141, *with* Tr. at 142).  These are fundamentally the same thing for the purposes of these findings.  For ease, the court refers to the mooring rings as "O-rings."

company policies and procedures, and the responsibilities of a deckhand.  (Tr. at 135–36, 173–74, 309–10; EMS Ex 7-2, 7-3).

27.  Following orientation, Evansville Marine assigned Thurby to work with Dakota Shreve, an experienced crewmember, for further training.  (Tr. at 137–38, 310).

28.  Captain Thurman piloted the vessel on which Thurby had his training.  (Tr. at 244, 310).

29.  This training included basic safety instruction, such as not putting one's hands and feet between objects that might cause injury, and the mooring practices of each dock.  (Tr. at 136, 245, 248, 311).

30.  Thurby landed at the Refinery Dock once or twice a week from his date of hire to the date of the incident.  (Tr. at 142).

31.  The practice at the Refinery Dock was to use the O-rings, rather than the kevels, and Thurby was trained to use the O-rings.  (Tr. at 142, 145, 245, 248).  There is no evidence showing an Evansville Marine employee used a kevel rather than an O-ring at any time when mooring a barge to the Refinery Dock.

32.  Thurby testified Captain Thurman trained Thurby to use the lowest available O-ring.  (Tr. at 146).  This is because the barge begins to sink as it is filled, and the mooring rope stretches and may snap if the barge is moored too high.  (*Id.* at 147).[3]  Thurby also testified Captain Thurman told him to "never use the kevel" at

---

[3] This becomes important later because the river was high on the day of the incident.  (Tr. at 49, 142).  Given the river level could come down and the barge would sink after filling by Owensboro Grain, concerns over the security of the mooring would have been heightened on the day of the incident.

the Refinery Dock. (*Id.* at 147). Captain Thurman disputes these points, but the court finds Thurby's testimony more credible.

33. Prior to the incident, Thurby always used the lowest available O-ring to tie barges off to the Refinery Dock. (Tr. at 147). However, he had not attempted to moor to an O-ring below the deck of a barge prior to the incident. (*Id.* at 249–50).

34. In mooring to an O-ring, Shreve trained Thurby to lift up the ring from the I-beam with his hands and run a line through it. (Tr. at 149)

**D.    Captain Todd Thurman**

35. Captain Thurman has 25 years of experience in the inland river towing industry and has operated vessels carrying barges in a variety of river conditions. (Tr. at 236–37).

36. Evansville Marine has employed Captain Thurman for around 24 years. (Tr. at 236, 304).

37. At all relevant times, the Coast Guard licensed Captain Thurman to pilot an inland river towing vessel for western rivers. (Tr. at 125, 237–38; EMS Ex. 8).

38. Captain Thurman began as a deckhand and then moved into a position piloting a vessel after he had between four and five years of experience as a deckhand. (Tr. at 237–38).

39. After that, he became a port captain for Evansville Marine in their Owensboro Office, where he served for approximately eight years before returning to work as a full-time pilot. (Tr. at 239–40).

40.    Following his return to piloting, Captain Thurman routinely worked on the M/V Loyd C. with Thurby.  (Tr. at 239, 241, 244, 304).

41.    On the whole, Captain Thurman was considered to be a good pilot and employee for Evansville Marine.  (Tr. at 306–08; EMS Ex. 10).

**E.    Evansville Marine Policies**

42.    Deckhands, like pilots, were required to follow Evansville Marine's policies and procedures as set forth in Evansville Marine's employee handbooks.  (Tr. at 316).

43.    Evansville Marine required that all employees be responsible for their own safety such that they should never place themselves in danger.  (Tr. at 312, 314).

44.    At all relevant times, Evansville Marine had a policy that its harbor vessels worked 12-hour watches with a crew of two, consisting of a pilot and a deckhand. (Thurby Ex. 12c).

45.    Evansville Marine safety policies also instructed employees to be alert for hazards while docking.  (Tr. at 71, 316; EMS Ex. 16-5; EMS Ex. 19-21; EMS Ex. 20-30).

46.    More specific rules also prohibited leaning over the edge of a vessel, (Tr. at 312–13; EMS Ex. 16-5; EMS Ex. 19-22; EMS Ex. 20-2), as well as requiring hands, fingers, and feet be kept away from areas that might crush them, (Tr. at 324, EMS Ex. 16-6; EMS Ex. 19-22; EMS Ex. 20-2).

47.    Evansville Marine also tasked the deckhand with communicating with the pilot regarding distance, alignment, speed, and hazards while docking, in addition to their responsibility to tie off barges.  (Tr. at 319; EMS Ex. 20-79).

48.    Company policies gave allowances to augment the crew size for, among other things, environment, weather, and climactic conditions.  (Thurby Ex. 12c).

**F.    The Incident on January 2, 2020**

49.    On January 2, 2020, Thurby and Captain Thurman began their shift at 5:00 a.m. (Tr. at 143).

50.    Evansville Marine assigned Captain Thurman as the master and pilot of the M/V Loyd C. and assigned Thurby as a deckhand.  (Tr. at 74).

51.    At the start of their shift, Thurby and Captain Thurman checked the boat and confirmed it was in good working order.  (Tr. at 143).

52.    Prior to picking up a barge, both crewmembers familiarized themselves with the prevailing weather conditions.  (Tr. at 143, 147, 261).

53.    The river level where the M/V Loyd C. operated was around 30-32 feet on the morning of January 2, 2020.  (Tr. at 326–27; EMS Ex. 11-9).

54.    The current was "moving fast."  (Tr. at 143).

55.    The ordinary level of the river at that area was 0 feet.  (Tr. at 83).

56.    The wind blew at 15 to 17 miles per hour out of the south, southwest prior to and during the incident.  (Tr. at 85; *id.* at 143 ("It was windy.")).

57.    In sum, "[t]he river was up, the current was up, [and] the wind was blowing, stronger than usual."  (Tr. at 147; *see also id.* at 143).  This limited the amount of time the crew had to react when docking downstream.  (Tr. at 82–83, 293–94).

58. Evansville Marine also knew windy conditions could create unsafe docking conditions.  (Tr. at 316 (explaining wind was one of the dangers associated with docking)).

59. That was particularly a concern with empty barges, as those barges sit higher in the water and act like a "big kite just waiting to take off" in the wind.  (Tr. at 71).

60. Thurby had never been to the Refinery Dock in similar conditions.  (Tr. at 148, 189).

61. Evansville Marine was aware of these conditions as shore management monitored wind and water conditions prior to the incident.  (Tr. at 341).  Indeed, Evansville Marine "constantly" monitors weather and water conditions.  (*Id.* at 325).

62. It also had additional personnel available to augment the crew of the M/V Loyd C. (Tr. at 94).

63. Evansville Marine decided the conditions did not warrant a second deckhand.  (Tr. at 302, 330).

64. At around 10:00 a.m., Captain Thurman received a request to deliver an empty barge—Barge CGBM-132—to the Refinery Dock.  (Tr. at 144, 262; *see also* Thurby Ex. 17a).

65. That barge was part of Fleet 759, which is located against the Indiana bank near mile 759 of the Ohio River.  (Tr. at 75; Thurby Ex. 21a).

66. This barge was downriver from the Refinery Dock.  (*See* Tr. at 259).

67.   Due to the barge's configuration in the fleet, its bow[4] faced out of the fleet.
      (Thurby Ex. 21a).  This meant that for the M/V Loyd C. to remove the barge from
      the fleet, it had to place its bow against the barge's bow and tie itself to the barge.
      (Tr. at 144).

68.   Owensboro Grain required the barge's "headers" to be upstream when the barge
      was tied off to the Refinery Dock.  (Tr. at 76, 145).  The "headers" are points on
      the barge which facilitate tying the barge off and which allowed Owensboro Grain
      to fill the barge.

69.   The headers on Barge CGBM-132 were on its bow.  (Tr. at 76).  This means if the
      M/V Loyd C. was tied to the barge's bow, it would need to travel downstream into
      the dock.  (*Id.* at 258).  If the M/V Loyd C. was tied to the barge's stern, it would
      need to travel upstream into the dock.  (*Id.*).

70.   Evansville Marine knew the above information about the barge, and the necessary
      path of the barge to get the headers upstream.  (Tr. at 50; *see also id.* at 322).

71.   After tying the M/V Loyd C. to the bow of the barge, Captain Thurman piloted the
      craft to the Kentucky side of the river, traveled upriver, passed the Refinery Dock,
      performed a U-turn across the river, and then approached the dock downstream.
      (Tr. at 144–45, 258, 260–61).

72.   Captain Thurman relied on Thurby to be his "eyes and ears" on the water.  (Tr. at
      247).

---

[4] The parties refer to the bow as the "rake" due to the bow being set at a sloping angle up from
the water.  For ease, the court refers to this area as the barge's bow.

73. As the M/V Loyd C. began its approach, Captain Thurman asked Thurby: "Is it possible to grab that ring?  Because that's where they like it."  (Tr. at 52).

74. Thurby responded that it was possible to grab the lower O-ring.  (Tr. at 148–49).

75. Captain Thurman asked Thurby if the O-ring was reachable because Captain Thurman had difficulty seeing where the dock and O-rings were in relation to the barge due to his position in the M/V Loyd C.  (Tr. at 287).

76. As they closed in on the dock, Thurby began calling Captain Thurman into the dock by radioing the distances as they approached the dock.  (Tr. at 177–78).

77. When the barge was around 20 feet away from the dock, Thurby noticed the ring he needed to catch was below the deck of the barge, due to the high water.  (Tr. at 178).

78. Captain Thurman's contemporaneous incident report indicates he told Thurby to "watch [his] hands."  (EMS Ex. at 3-1).  Both Captain Thurman and Thurby dispute this evidence at trial, but the court finds Captain Thurman's contemporaneous notes more credible.  This evidence demonstrates both Captain Thurman and Thurby knew that Thurby would have to put himself in a dangerous position to tie off the barge.

79. At this point, Thurby was on the barge and looking to tie the barge off to the dock. (*See, e.g.*, Tr. at 149).

80. Thurby testified the O-ring was below the deck of the barge by about 2-3 feet at the time of landing, making it difficult to reach.  (Tr. at 149, 175).  Evansville Marine argues, based on Thurby's deposition testimony that another ring was

reachable above the deck.  The court rejects this argument as the rings were

spaced 11 feet and 3 inches apart, which means the next ring was 8 feet and 3

inches to 9 feet and 3 inches above the deck of the barge.  (*See* FF No. 18).

81.   A kevel was within reach and around chest height.  (Tr. at 187–88).  But standing

on the barge could still have been dangerous as a sudden jolt could have caused

Thurby to fall overboard, which is a constant danger in difficult environmental

conditions like those on January 2, 2020.  (*Id.* at 70).

82.   At this point, Captain Thurman allowed the current to push the M/V Loyd C. and

barge into the dock while he made adjustments with his engines.  (Tr. at 269, 293).

83.   However, due to the fast current that day, the M/V Loyd C. approached the dock

faster than normal.  (Tr. at 148).  Thurby had not approached the dock at that

speed prior to the incident.  (*Id.*).  Captain Thurman testified that their approach

was slow, or at a "walk," (*id.* at 274), but this does not contradict the testimony

that the approach was faster than normal because a vehicle may be moving

relatively slowly, but still faster than it had previously and faster than reasonably

prudent given the situation.

84.   While continuing to radio measurements, Thurby got down on one knee when the

barge was approximately 5 feet from the dock.  (Tr. at 149).

85.   Once Thurby got down on one knee, he stopped giving distances so he could focus

on attempting to tie off the barge.  (Tr. at 180).

86.   Captain Thurman took his eyes off the river and directed his attention to Thurby

and saw him go down to one knee.  (Tr. at 274).

87. Once Captain Thurman saw Thurby go down to one knee, he knew the ring he instructed Thurby to catch was below the deck of the barge.  (Tr. at 283–84).

88. Captain Thurman then turned his attention back to the water to watch "the other end" of the barge to prevent it from approaching the dock.  (Tr. at 276).

89. Despite knowing Thurby would have to reach below the deck, Captain Thurman did not instruct Thurby to attempt to use a kevel, tell him that they would find a different way to tie off the barge, or abort the landing.  (*See* Tr. at 275–76).

90. When the barge moved within 6 inches of the ring, Thurby lowered himself onto his stomach and reached his left arm below the deck of the barge to attempt to grab the ring.  (Tr. at 149, 180–81).

91. On his stomach, Thurby laid at an angle on the deck of the barge and faced upstream (toward the bow of the barge and against the direction of travel) and reached out with his left hand to grab the ring at 9 o'clock.  (Tr. at 149–151, 181). This means Thurby's shoulders must have been over the deck of the barge to facilitate the reach of his left arm.

92. After grabbing the ring with his left hand, Thurby lifted the ring away from the I-beam post and began feeding a line through with his right hand.  (Tr. at 149–50, 180–81).

93. Thurby's hand was not placed between the barge and the dock.  (Tr. at 149–50, 180–81).

94. Captain Thurman then took his eyes off the water a second time to look at Thurby and saw him on his belly.  (Tr. at 276).

14

95.   Captain Thurman attempted to warn Thurby of the dangerous position he was in but was unable to before Thurby was injured.  (Tr. at 276).

96.   As a result of Captain Thurman's distraction (i.e., watching Thurby instead of his landing), the bow end of the barge hit the dock.  (Tr. at 181, 276).

97.   The barge contacted the dock with such force that it caused the structure to shake. (Tr. at 149, 183, 193, 195).

98.   The recoil of the dock shaking caused the O-ring to snap back toward the I-beam, crushing Thurby's left hand against the flange of the I-beam.  (Tr. at 149, 183, 193, 195).

99.   Captain Thurman's contemporaneous report explains Thurby's hand got caught between the barge and the dock, but that was only a guess as Captain Thurman did not actually see the incident.  (Tr. at 295–96).  The court rejects Evansville Marine's theory that Thurby's hand was caught between the dock and the barge because of the angle at which Thurby was laying.  Given that angle, the barge would have caused injuries not only to Thurby's hand but also to his forearm.  (*Id.* at 185–86).

100.  Thurby's injury occurred 8–10 seconds after he laid down and reached for the O-ring.  (Tr. at 181).

101.  Thurby felt the crunch of his fingers.  (Tr. at 154).  The pain was the maximum possible on a 1 out of 10 scale.  (*Id.*).

102.  Captain Thurman radioed for help.  (Tr. at 153).

103.   While there were no Owensboro Grain workers on the dock before the incident, Owensboro Grain personnel came onto the dock to tie off the barge and help Thurby to solid ground.  (Tr. at 153, 273).

104.   Thurby was transported to the Owensboro Regional Hospital and then transported by air to Jewish Hospital in Louisville, Kentucky.  (Tr. at 154–55).  Winds were sufficiently high that it was unsafe to transfer Thurby by helicopter; a plane was required.  (Tr. at 154).  This supports the court's later conclusion that a second deckhand was needed to deal with the windy conditions.

105.   Had Thurby used the kevel available at chest height, his left hand would not have been crushed.  (Tr. at 200).

106.   Contrary to Evansville Marine's suggestion, Thurby could not have waited for the barge to stop moving to grab the O-ring because he had to catch the ring before the current carried the barge past the dock.  (Tr. at 82–83, 200, 292).

**G.   Crew Size**

107.   Per Evansville Marine policy, harbor boats operated with a crew of two: a pilot and a deckhand.  (Thurby Ex. 12c).

108.   Evansville Marine would add crewmembers in response to certain "weather conditions."  (Thurby Ex. 12c; Tr. at 69–70, 302).  It did this on multiple occasions, even when landing at the Refinery Dock.  (Thurby Ex. 17 (showing at least 32 occasions where Evansville Marine crewed the M/V Loyd C. with two deckhands while spotting barges at the Refinery Dock)).

109.   Evansville Marine, through its CEO, proposes "weather conditions" meant conditions that created ice on the barge decks.  (Tr. at 302).  But the court finds finds Evansville Marine regularly crewed the M/V Loyd C. with two deckhands in response to non-icy weather conditions, such as high winds or current.  The evidence shows Evansville Marine frequently crewed the M/V Loyd C. with two deckhands in July and August where there was almost certainly no ice on the decks.  (*See, e.g.*, Thurby Ex. 17 at 1165).  And these supplementations were not solely for training employees because Thurby and Dakota Shreve both served as deckhands well past Thurby's two-week training period.  (*Compare* Tr. at 169 (explaining that for two weeks after starting with Evansville Marine, Thurby worked with an experience deckhand), *with* Thurby Ex. 17 at 1399 (showing Thurby and Shreve working as a deckhand four months after Thurby was hired)).  Nor were these supplementations to give Dakota Shreve the opportunity to practice piloting because the M/V Loyd C.'s crew log lists Shreve as "other," instead of as a "deckhand," on certain occasions.  (Thurby Ex. 17 at 1443).  Where the logs list Shreve as a deckhand, he worked as a deckhand along with other deckhands assigned to the ship.

110.   A second deckhand would have ameliorated some of the dangerous conditions present on January 2, 2020.

111.   According to Plaintiff's expert, Captain Gary Hensley, a second deckhand could have given Captain Thurman the option to spin the barge downstream and allow the M/V Loyd C. to proceed upstream into the dock, rather than downstream.  (Tr.

17

at 80–81, 83, 99).[5]  Proceeding upstream would have given the vessel more time to settle at the Refinery Dock and the deckhands more time to tie off the barge off. (*See id.* at 83, 200).  A second deckhand also could have called out distances allowing Thurby to focus on tying off the barge and allowing Captain Thurman to keep his eyes on his approach.  (Tr. at 98–99).  This could have allowed the second deckhand to warn Thurby that the vessel was about to hit the dock so he could move his hand.  (*Id.*).

112.    These facts establish that the M/V Loyd C. was unseaworthy—i.e., not reasonably fit for its intended service—on January 2, 2020.  (*See* CL Nos. 21–37).

### H.    Thurby's Injuries

113.    After being airlifted to Jewish Hospital, Thurby came under the care of Dr. Tuna Ozyurekoglu.  (Tr. at 155).

114.    Dr. Ozyurekoglu is a board-certified hand surgeon and has been on the faculty at the University of Louisville since 2003.  (Thurby Ex. 58).  He is an associate professor at the University of Louisville in general surgery and hand surgery, and an assistant professor in the Department of Orthopedics.  (*Id.*).  He has been practicing since 2003 and has been published in the Journal of Hand Surgery, as well as several other journals.  (*Id.*).  Dr. Ozyurekoglu qualifies as an expert witness under Rule 702.

---

[5] Captain Hensley has more than 30 years of experience in the maritime industry, beginning as a deckhand and working his way up to being a pilot of various inland towing vessels.  (Thurby Ex. 48).  The court finds Captain Hensley qualifies as an expert witness under Rule 702.

115.    He determined Thurby sustained a crush/avulsion injury to his hand.  (Filing No. 147-6, Dr. Ozyurekoglu Dep. at 32).

116.    That injury was caused by Thurby's workplace injury on January 2, 2020.  (Dr. Ozyurekoglu Dep. at 62).

117.    Dr. Ozyurekoglu performed a surgical repair of Thurby's thumbnail bed fracture and left thumb, a partial amputation of his index finger at the proximal interphalangeal joint, and attempted to revascularize Thurby's middle and ring fingers.  (Dr. Ozyurekoglu Dep. at 8, 62).

118.    Dr. Ozyurekoglu's repair of Thurby's left thumb was successful and Thurby's left thumb is fully functional.  (Dr. Ozyurekoglu Dep. at 9).

119.    Within 24 hours of the surgery, Thurby watched his middle and ring fingers turn "black and mushy" because the attempt at revascularization failed.  (Tr. at 155).

120.    Thurby was required to go in for a second amputation, this time of his ring and middle fingers on his left hand.  (Tr. at 155; Dr. Ozyurekoglu Dep. at 9–10).

121.    Thereafter, Dr. Ozyurekoglu continued to treat Thurby on an out-patient basis through March 2021.  (Dr. Ozyurekoglu Dep. at 44).

122.     Beginning in May 2020, Thurby participated in physical therapy at Kort Therapy.  (Tr. at 156–57; Dr. Ozyurekoglu Dep. at 10, 46–47).

123.    This therapy included transcutaneous electrical nerve stimulation and was incredibly painful.  (Tr. at 207–08; Dr. Ozyurekoglu Dep. at 46).

124.    Thurby was born with an ulnar deficiency, which resulted in him missing his pinkie finger on each hand, which means he is left with only his thumb and pointer

finger on his left hand.  (Tr. at 155; Thurby Ex. 45A).  Thurby can still pinch

things between his thumb and forefinger.  (Dr. Ozyurekoglu Dep. at 10–11, 15).

125.  Dr. Ozyurekoglu eventually determined Thurby reached maximum medical

improvement and assigned permanent restrictions limiting Thurby to medium duty

work, lifting a maximum of 50 pounds, and frequently lifting up to 25 pounds

using both hands.  (Tr. at 191; Dr. Ozyurekoglu Dep. at 15, 24, 48).

126.  These restrictions are without a prosthetic device.  (Dr. Ozyurekoglu Dep. at 15–

17, 48).

127.  The injuries to Thurby's left hand are permanent.  (Dr. Ozyurekoglu Dep. at 63).

128.  Thurby's injuries resulted in a 44% impairment rating of his left hand and 25%

impairment rating of his whole body.  (Dr. Ozyurekoglu Dep. at 49–50).

129.  Thurby's injuries resulted in disability and disfigurement and, consequently, limits

his earning capacity in the future.

**I.     Thurby's Prosthesis**

130.  Dr. Ozyurekoglu referred Thurby to a prosthetist at Hangar Clinic.  (Dr.

Ozyurekoglu Dep. at 45).

131.  This referral was to determine what prosthesis Thurby could use in his daily life.

(Filing No. 147-5, Eric Kimsey Dep. at 10–11).

132.  Eric Kimsey, of Hangar Clinic, is a licensed certified prosthetist since 2006 and

evaluated Thurby.  (Kimsey Dep. at 10–11).  He has an undergraduate degree in

biomedical engineering.  (*Id.* at 10).  The court finds he qualifies as an expert

witness under Rule 702.

133.   Kimsey recommended two prostheses, the Point Design, with two mechanical
       locking fingers, and the Naked Prosthetic for finer manipulations, like picking up
       small objects.  (Kimsey Dep. at 27–29, 54–55).

134.   However, Thurby was ultimately ineligible for the Naked Prosthetic due to the
       presentation of Thurby's residual digits.  (Filing No. 144).

135.   This left Thurby with the Point Design prosthesis, which requires him to manually
       manipulate and lock the fingers in place.  (Tr. at 157–58).

136.   Thurby received this prosthesis on February 16, 2022.  (Kimsey Dep. at 30, 33;
       Filing No. 144).

137.   According to the Hanger's maintenance estimates and warranty information for the
       Point Design prosthesis, Thurby's prosthesis will require complete replacement
       every three to five years.  (Thurby Ex. 44 at P-HANGER000005; Kimsey Dep. at
       50).  No average device lasts longer than five years for an adult; devices that are
       worn a lot tend to last closer to three years, while devices that are worn less
       frequently will fail toward the five-year mark.  (*See* Kimsey Dep. at 41–42
       (explaining how using a prosthesis less will help extend its useful life and how
       Kimsey could not be entirely sure where Thurby's prosthesis would fall in this 3-
       to 5-year window)).

138.   The maintenance costs for the prosthesis are approximately 5% of the total cost of
       the prosthesis per year.  (Thurby Ex. 44 at P-HANGER000005).  Evansville
       Marine argues that because Thurby has yet to need maintenance on his prosthesis,

this cost should be discounted.  This argument is rejected because the lack of present maintenance costs says little about maintenance costs in the future.

139.    The Point Design prosthesis costs $27,942.17.  (*See* Thurby Ex. 44 at P-HANGER000002; *see also* Filing No. 144, Stipulations of Fact).  Evansville Marine contends the cost of the prosthesis is $21,500 because Hanger accepted that amount as accord and satisfaction for the prosthesis.  That proposed finding is rejected.  Hanger's billing makes clear that it charges $27,942.17 for the Point Design prosthesis and it is entirely speculative that Hanger will allow discounts of the type it gave to Evansville Marine in the future.

140.    The Point Design prosthesis is limited in its uses—Thurby regularly loses grip of things—and it causes Thurby significant pain.  (Tr. at 160, 208–09, 211).

141.    Even with the prosthesis, Thurby needs help going to the bathroom, showering, washing his hair, buttoning his shirts, tying his shoes, and cutting his food.  (Tr. at 161, 205–06, 211–13).

142.    Thurby can no longer do certain activities like bowling, roller-skating, and ice skating due to the risk of re-injury.  (Tr. at 213).  He avoids school activities with his children, like father-daughter dances, due to the questions he receives about his injured hand.  (Tr. at 214).

143.    He also has difficulty driving, picking things up, and mowing the lawn without taking frequent breaks due to the pain coming from the associated vibrations.  (Tr. at 161–62, 211).

144.  When using the prosthesis, Thurby's pain ranges from a 6 to an 8 on a scale of 1 to 10.  (Tr. at 160).

145.  Without the prosthesis, Thurby's daily pain is constant and ranges from a 4 to a 7 on a scale of 1 to 10.  (Dr. Ozyurekoglu Dep. at 57–58).  Thurby also experiences frequent phantom pain at the amputation site.  (Tr. at 156).

146.  Thurby has not had a pain-free day since his injury.  (Tr. at 160).

147.  This level of pain is likely to remain constant for the rest of Thurby's life.  (Dr. Ozyurekoglu Dep. at 64).

148.  The life expectancy of a male of Thurby's age is another 45.1 years.  (Thurby Ex. 70).

**J.      Thurby's Mental Health**

149.  Prior to the incident, Thurby had a history of anxiety, panic attacks, bipolar disorder, and depression, for which he was taking medication.  (Tr. at 217).

150.  These issues, while previously severe when Thurby was a teenager, were minor and well controlled by the time he was an adult.  (Thurby Ex. 74 at 720, 752–53; *compare* EMS Ex. 27-0051 (discussing Thurby's suicidal tendencies and behavioral problems at 15 years old), *with id.* at 0014 (noting that by 2019, Thurby's symptoms were "well controlled")).

151.  He was prescribed 50mg of Zoloft to manage these issues, which controlled his symptoms.  (Thurby Ex. 74 at 721).  50 milligrams of Zoloft is a low dose for an adult, as a normal therapeutic dose begins at 100 milligrams for an adult.  (Filing No. 147-3, Stanishia Dep. 33–34).

152.  The incident on January 2, 2020, aggravated Thurby's existing depression.  (Jordan Dep. at 74).  He slept a lot, did not want to leave the house, and kept his hands in his pockets to prevent others from seeing his hand and asking questions. Consequently, his primary care provider referred him to River Valley Behavioral Health.  (Tr. at 217; Thurby Ex. 68 at P-RVBH002).

153.  There, Darlene Jordan—a Licensed Professional Clinical Counselor—and Melanie Stanishia—an Advanced Practice Registered Nurse—treated Thurby's mental condition.  (Tr. at 192).

154.  Jordan obtained a bachelor's degree in psychology and a master's degree in counseling and human development.  (Filing No. 47-4, Jordan Dep. at 6).  She is a Licensed Professional Clinical Counselor in Kentucky and has practiced since 2006.  (*Id.* at 5, 7).  Kentucky requires her to be trained in, and provide, services for the "assessment, evaluation, treatment planning, amelioration, and remediation" of various mental health issues.  Ky. Rev. Stat. § 335.500(5). Kentucky also requires an advanced degree in counseling, 4,000 hours of experience after receiving the advanced degree, 60 classroom hours in the "[p]riniciples of etiology [i.e. the study of causation], diagnosis, treatment planning, and prevention" of mental health disorders, and passing an examination on those topics.  *Id.* § 335.525(1)(c–f).  Jordan has satisfied these requirements. (*See* Jordan Dep. at 6–7).  Therefore, after reviewing the record and Kentucky statutory requirements, Darlene Jordan qualifies as an expert witness under Rule

24

702.  (*See also* Filing No. 111, Entry Denying Motion to Exclude Testimony of Darlene Jordan and Melanie Stanishia).

155.    Stanishia obtained a bachelor's degree in nursing and a master's degree in the same.  (Filing No. 147-3, Stanishia Dep. 7–8).  She was a registered nurse for five years before becoming an advanced practice registered nurse.  (*Id.* at 7, 9).  Advanced practice registered nurses have more stringent education and statutory requirements than licensed professional clinical counselors under Kentucky law and are familiar with the same topics.  *See e.g.*, Ky. Rev. Stat. § 314.042; *see also id.* § 314.011.  Stanishia qualifies as an expert witness under Rule 702.  (*See also* Filing No. 111).

156.    Thurby presented at the River Valley Behavioral Clinic as angry, anxious, and depressed due to the injury.  (Thurby Ex. 68 at P-RVBH00127).  He also felt that his life had completely changed due to the injury which made him feel insecure in public, sad, helpless, hopeless, and worthless.  (*Id.* at P-RVBH008, 13, 23, 37, 56, 64, 73, 77, 84, 105, 107).

157.    Following her evaluation, Stanishia increased Thurby's dose of Zoloft to 100 milligrams daily and added Wellbutrin for depression and motivation.  (Thurby Ex. 68 at P-RVBH0027).

158.    She would need to, again, increase his dose to 150 milligrams the next year. (Thurby Ex. 68 at P-RVBJ0066).

159.    She also prescribed Topamax as a mood stabilizer and weight loss medication. (Thurby Ex. 68 at P-VBH00127).

160.   Stanishia diagnosed Thurby with major depressive disorder (recurrent), PTSD, and anxiety.  (Stanishia Dep. at 25).

161.   Evansville Marine makes much of the fact that neither Jordan nor Stanishia knew about Thurby's behavioral problems as a minor.  The court is not persuaded this evidence alone makes Jordan and Stanishia's testimony regarding Thurby's current mental state unreliable.  There is ample evidence in the record of his mental state both before and after his injury supporting their opinions.  (*Compare* EMS Ex. 27-0051 (discussing Thurby's suicidal tendencies and behavior problems at 15 years old), *with id.* at 0014 (noting that immediately prior to the accident, Thurby's symptoms were "well controlled")).

162.   Thurby's chronic pain contributes to and aggravates his depression, anxiety, and PTSD symptoms.  (Stanishia Dep. at 42).

163.   While Thurby's condition has improved following treatment, (Tr. at 192), he will continue to experience depression, anxiety, and PTSD symptoms for the rest of his life due to the January 2, 2020 injury, (Stanishia Dep. at 50).

164.   Thurby will require ongoing treatment to monitor his medications and see if his conditions have worsened.  (Stanishia Dep. at 47).

165.   Thurby continues to see Stanishia once every three months.  (Tr. at 192).

166.   Thurby no longer sees Darlene Jordan.  (Tr. at 192).

167.   An appointment with Stanishia costs $260 a session.  (Stanishia Dep. at 50).

**K.      Post Incident Work History and Vocational Capacity**

168.    Following his injury and up to 2022, Evansville Marine paid Thurby maintenance and cure as required by the Jones Act.  (EMS Ex. 26-2, 26-3).

169.    Evansville Marine also paid Thurby advanced wages totaling $66,119.82 through December 31, 2022.  (Tr. at 191, 358–59, 362; EMS Ex. 26-4, 26-5).

170.    Once Thurby felt comfortable enough to get back into society, he sought help from the Kentucky Office of Vocational Rehabilitation.  (Tr. at 163; Thurby Exs. 72, 75).

171.    Following interviews and meetings with that office, Thurby found part-time employment at Lowe's.  (Thurby Ex. 75 at 39; Tr. at 164–65).

172.    Lowe's was not a good fit because Thurby had to deal with customers pointing at him and asking about his hand.  (Tr. at 165).  The job also required him to get boxes off shelves with a ladder, which is something he was unable to do given his injury.  (*Id.*).

173.    Thurby quit his position at Lowe's but soon found employment with the Humane Society of Henderson, Kentucky, as a full-time animal control officer.  (Tr. at 165–66).

174.    Thurby is able to complete all of his job duties in that position.  (Filing No. 132, Thurby Dep. at 215).

175.    He typically works around 45 hours a week.  (Thurby Dep. at 215).

176.    Thurby's initial wage was $14.00 an hour, earning time and a half for overtime and when on call.  (Tr. at 166).  Following Thurby's completion of euthanasia training

and certification, Thurby's pay rate is expected to increase to $14.50 an hour, although the raise has yet to go into effect. (*Id.*). Evansville Marine suggests Thurby's pay will increase to $18.00 an hour following the completion of euthanasia training and cites the deposition of a member of the Kentucky Office of Rehabilitation. The court finds Thurby more credible on his own hourly salary, particularly given Thurby's live testimony at trial.

177.  Thurby enjoys his job as an animal control officer and is planning to remain in that position long-term. (Tr. at 166).

178.  Thurby does not receive benefits as part of his employment. (Thurby Dep. at 216).

179.  Given Thurby's employment history post-accident, the court finds Thurby is capable of maintaining full-time employment at an hourly rate of $14.50 an hour.

180.  Thurby testified that prior to the incident on January 2, 2020, he planned to work until he was 62. (Tr. at 168). He indicated he would have liked to continue working for Evansville Marine so long as he could work his way up to Captain. (*Id.*).

## CONCLUSIONS OF LAW

1.  To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law. To the extent any of the conclusions of a law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2.  The court has subject-matter jurisdiction over this action pursuant to U.S. Const. Art. III Sec. 2, cl. 1, and 28 U.S.C. § 1333.

3.    This is an action in admiralty, not at law.  *See* Fed. R. Civ. P. 9(h).

**A.    Jones Act Negligence**

4.    A seaman injured in the course of his employment may bring a civil action under the Jones Act against his employer.  46 U.S.C. § 30104.

5.    The Jones Act extended the protections of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51, to seamen and provides FELA's "heightened legal protection to eligible seamen because of their exposure to the 'perils of the sea' in the course of their duties."  *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 631 (7th Cir. 2005); *see also Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031–32 (7th Cir. 1990) (explaining Jones Act is designed to give seamen an available remedy for injuries in an inherently dangerous profession).

6.    "The Jones Act provides a generous tort remedy for injuries to seamen, in recognition . . . of the hazards of sea duty."  *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 584 (7th Cir. 2005).

7.    "[A] Jones Act employer may be liable for the negligence or intentional torts of its employees" under the doctrine of *respondeat superior*.  *Sobieski*, 413 F.3d at 631.

8.    To prevail on a Jones Act claim, the employee must show, by a preponderance of the evidence, that: (1) he is a seaman; (2) the employee suffered the injury in the course of his employment; (3) the employer was negligent; and (4) the employers negligence caused the employees injury, at least in part.  *See, e.g.*, *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 451 (4th Cir. 2012).

9.    In common-law parlance, this is simply the standard negligence test of duty, breach, causation, and damages. *See Martin v. Harris*, 560 F.3d 210, 216 (4th Cir. 2009) (explaining how Jones Act claims "draw on common-law principals").

10.   The employer has a duty to provide seamen in their employ with a safe working environment. *Pet. of Atlass*, 350 F.2d 592, 599 (7th Cir. 1965).

11.   An employer breaches that duty when a seaman is required "to do his work in a dangerous manner when there are other and safer ways to do it." *Pedersen v. Diesel Tankers*, 280 F. Supp. 421, 424 (S.D.N.Y. 1967); *see also Marvin v. Cent. Gulf Lines, Inc.*, 554 F.2d 1295, 1297 (5th Cir. 1977) (citing *Pedersen* with approval for this proposition).

12.   Unlike common law negligence, however, the seaman's burden of proving causation is "'very light' and has been described as featherweight.'" *Cella v. United States*, 998 F.2d 418, 427–28 (7th Cir. 1993) (quoting *Zapata Haynie Corp. v. Arthur*, 980 F.2d 287, 289 (5th Cir. 1992) and citing a multitude of other 5th Circuit cases).

13.   The plaintiff only needs to show that "negligence of the employer played any part, however small, in the injury." *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 508 (1957).

14.   Thurby has satisfied each of these elements by a preponderance of the evidence.

15.   The parties stipulate Thurby was a Jones Act seaman at the time of the incident. (Filing No. 87).

16. Thurby was injured during the course of his employment when attempting to tie off a barge at the Refinery Dock.

17. Evansville Marine breached its duty to exercise reasonable care when it required Thurby to operate as a single deckhand in high winds and water as well as a quick current while landing at the Refinery Dock. There was a safer way to accomplish this task that Evansville Marine chose not to pursue despite being aware of the conditions. It would have been safer to add a second deckhand to ameliorate issues with the speedy current and high winds and give Captain Thurman the option to dock against the current which would have provided Thurby more opportunity to allow the barge to settle out before tying it off.

18. The failure to have a second deckhand on board was one factual cause of Thurby's injury, demonstrating that Thurby has met his featherweight burden to show causation.

19. Accordingly, Thurby has proven, by a preponderance of the evidence, his claim for Jones Act Negligence against Evansville Marine.

**B.    Unseaworthiness Under Maritime Law**

20. The Jones Act did not create an "exclusive remedy" for a seaman's injuries, but rather "preserve[d]" and supplemented "common-law causes of action." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416–17 (2009).

21. Unseaworthiness was one such common-law cause of action that, now, has "significant overlap" with Jones Act negligence. *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2282 (2019).

22.   While there are differences, "[o]ne leading treatise" describes unseaworthiness and

Jones Act negligence as "alternative grounds of recovery for a single cause of

action." *The Dutra Grp.*, 139 S. Ct. at 2282 (quoting 2 R. Force & M. Norris, The

Law of Seamen § 30:90 (5th ed. 2003)).

23.   Unlike the Jones Act, which requires proof of negligence, *Lewis v. Lewis & Clark

Marine, Inc.*, 531 U.S. 438, 441 (2001), unseaworthiness imposes strict liability

without fault, *Hughes v. ContiCarriers & Terminals, Inc.*, 6 F.3d 1195, 1197 (7th

Cir. 1993).

24.   Whereas Jones Act claims are brought against the seaman's employer, 46 U.S.C.

§ 30104, unseaworthiness claims run against the vessel's owner, *Mahnich v. S. S.S.

Co.*, 321 U.S. 96, 100–01 (1944).

25.   Finally, unlike the lightened burden for causation in Jones Act negligence cases, a

claim for unseaworthiness requires "proximate cause." *The Arizona v. Anelich*,

298 U.S. 110, 117–18 (1936) (discussing proximate cause in the context of an

unseaworthiness claim).

26.   To succeed on an unseaworthiness claim, the plaintiff must show, by a

preponderance of the evidence, that (1) the vessel was unseaworthy; and (2) the

unseaworthy condition was the proximate cause of his injury. *See ContiCarriers*,

6 F.3d at 1197.

27.   To be seaworthy, the vessel "must be reasonably suitable for her intended service."

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

28. This "imposes an absolute, nondelegable duty on a shipowner to provide a vessel and its equipment, appurtenances, and crew reasonably suited for their intended purposes." *Am. River Transp. Co. v. Phelps*, 189 F. Supp. 2d 835, 850 (S.D. Ill. 2001) (citing *Brister v. A.W.I., Inc.*, 946 F.2d 350, 355 (5th Cir. 1991)).

29. Thus, a vessel is unseaworthy if, among other things, it lacks sufficient crew for the task assigned to it. *Usner v. Luckenback Overseas Corp.*, 400 U.S. 494, 517–18 (1971).

30. While seaworthiness is a question of fact here, a review of similar cases helps illustrate why the lack of a second deckhand made the M/V Loyd C. unseaworthy on January 2, 2020, when Thurby attempted to tie the barge to the Refinery Dock. *See, e.g.*, *Morrell v. United States*, 297 F.2d 662, 663 (9th Cir. 1961) (explaining whether a vessel is unseaworthy is ordinarily a question of fact).

31. In a "classic case of unseaworthiness," a watch officer on a vessel ordered a deckhand to change from high suction to low suction, which required the deckhand to open gate valves by turning a wheel. *Am. President Lines, Ltd. v. Redfern*, 345 F.2d 629, 631–32 (9th Cir. 1965). But the valve was stuck and could only be safely opened by two men. *Id.* When the deckhand injured his back attempting to turn the wheel, the Ninth Circuit affirmed a district court's determination that the vessel had been unseaworthy for being improperly manned. *Id.*; *see also American President Lines, Ltd. v. Welch*, 377 F.2d 501 (9th Cir. 1967) (substantially similar facts where one deckhand attempted to repair a lube pump created an unseaworthy condition).

33

32.    Similarly in *Williams v. Central Contracting & Marine, Inc.*, No. 15-CV-867,

2018 WL 1612019 (S.D. Ill. April 3, 2018), the Southern District of Illinois found

a ship unseaworthy because the ship "assigned too few deckhands to safely

perform the job" asked of the injured deckhand. *Id.* at 12.  Specifically, the

deckhand, alone, attempted to tie two barges together and fell after a kink caused

the wire to jump off the tie point throwing the deckhand off-balance and causing a

hurt back. *Id.* at 3.  The *Williams* court explained that "using a second deckhand"

to ensure there were no kinks, so the wire did not suddenly jump off the tie point

was required to avoid an unreasonably dangerous condition on the vessel. *Id.* at

12.; *see also Britton v. U.S.S. Great Lakes Fleet, Inc.*, 302 F.3d 812, 818 (8th Cir.

2002) (reversing grant of summary judgment on unseaworthiness claim because

crewmember "created a genuine issue of material fact regarding the number of

available crew on deck" which could lead a "reasonable jury . . . [to] conclude that

[his] injury was a direct result of the shortage of deckhands.")

33.    Finally, the Supreme Court reversed a Court of Appeals that affirmed the

dismissal of an unseaworthiness claim in *Waldron v. Moore-McCormack Lines,

Inc.*, 386 U.S. 724 (1967).  There, a seaman had been injured when he attempting

to carry a heavy eight-inch rope with only two people where "[t]here was expert

evidence to the effect that 3 or 4 men rather than 2 were required to carry the line

in order to constitute safe and prudent seamanship." *Id.* at 725 (internal quotation

marks omitted).  The Supreme Court explained that due to "the hazards of marine

service, the helplessness of the men to ward off the perils of unseaworthiness, the

harshness of forcing them to shoulder their losses alone, and the broad range of the humanitarian policy of the doctrine of unseaworthiness," the shipowner cannot escape liability for unseaworthiness through a failure to provide an adequate number of crew for an assigned task. *Id.* at 728 (quoting *Reed v. S.S. Yaka*, 373 U.S. 410, 413 (1963)) (internal quotation marks omitted).

34. Because the vessel was inadequately manned to land at the Refinery Dock given the conditions present on January 2, 2020, the M/V Loyd C. was unseaworthy.

35. To establish the unseaworthy condition proximately caused a plaintiff's injury, a plaintiff must prove that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Brister*, 946 F.2d at 355 (quoting *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988)).

36. Here, the lack of a second deckhand on the M/V Loyd C. played a substantial part in bringing about Thurby's injury because it infected every part of the landing process on January 2, 2020. It forced the barge to travel downstream into the dock; forced Thurby to call out distances and focus on tying the barge at the same time; caused Thurby to stop calling distances, thereby leaving Captain Thurman without his "eyes" on the water when the boat was closest to the dock; pressured Captain Thurman to watch Thurby and his landing at the same time; and prevented any warning from being given to Thurby prior to the barge hitting the dock.

37. For those same reasons, the injury was a reasonably probable consequence of not having a second deckhand. While Evansville Marine argues Thurby's contributory negligence (i.e., his decision to use a ring below the deck of the barge rather than a kevel), which is discussed further below, severs any reasonable probability that the lack of a second deckhand caused the injury, the court is unpersuaded. The lack of a second deckhand necessitated a downstream landing, which provides the deckhand less time to tie off the barge, because the M/V Loyd C. could only safely turn the barge around and continue upstream into the dock with a second deckhand. *See* FF No. 111 ("[A] second deckhand could have given Captain Thurman the option to spin the barge downstream and allow the M/V Loyd C. to proceed upstream into the dock, rather than downstream."). With less time to tie off than usual due to the unseaworthy condition, it was reasonably foreseeable and probable that a deckhand would resort to the only tie off point they had ever used at that dock.

38. Thurby has proven, by a preponderance of the evidence, that the M/V Loyd C. was unseaworthy, and this condition proximately caused his injuries.

39. Because Thurby has prevailed on his claims of Jones Act negligence and maritime law unseaworthiness, Evansville Marine's Petition for Exoneration must be **DENIED**.

C.    **Limitation of Liability**

40.    Evansville Marine petitions for a limitation of liability pursuant 46 U.S.C.

§ 30529.

41.    Once a claimant has met their burden of showing they suffered damages resulting

from negligence or unseaworthiness, the burden shifts to the shipowner to

demonstrate it meets the statutory requirements for limitation. *See In re Moran*

*Towing Corp.*, 166 F. Supp. 2d 773, 775 (E.D.N.Y. 2001); *Bankers Tr. Co. v.*

*Bethlehem Steel Corp.*, 761 F.2d 943, 948 n.14 (3d Cir. 1985).

42.    A ship's owner may limit its liability only where the claim arises out of an incident

that occurred "without the privity or knowledge of the owner." 46 U.S.C.

§ 30523(b).

43.    In claims for personal injury, "the privity or knowledge of the master or the

owner's superintendent or managing agent, at or before the beginning of each

voyage, is imputed to the owner." 46 U.S.C. § 30524(e).

44.    "All that is needed to deny limitation is that the shipowner, by prior action or

inaction set[s] into motion a chain of circumstances which may be a contributing

cause even though not the immediate or proximate cause of" an injury. *In re*

*Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954

F.2d 1279, 1303 (7th Cir. 1992) (quoting *Tug Ocean Prince, Inc. v. United States*,

584 F.2d 1151, 1158 (2d Cir. 1978)) (internal quotation marks omitted and

alteration in original).

45. Here, Evansville Marine knew the weather conditions and river stage, knew the orientation of the barge in the fleet such that it would have to downstream into the dock, knew it had only assigned one deckhand to the M/V Loyd C., and failed to supplement the crew given that information.

46. Because Evansville Marine's own failure to supplement the crew was a contributing cause of Thurby's injury, Evansville Marine was not without privity or knowledge of the negligence or unseaworthy condition.

47. Accordingly, Evansville Marine's Petition for Limitation is **DENIED**.

**D.    Contributory Fault**

48. Under the Jones Act and traditional maritime law principles, a seaman is obligated to act with reasonable and ordinary prudence in the exercise of their duties. *See Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997) (applying reasonable seaman standard to determine contributory fault to a Jones Act claim); *see also ContiCarriers*, 6 F.3d at 1199 (applying contributory fault doctrine to unseaworthiness claim).

49. Under the Jones Act, "recovery is permitted to the extent of the employer's negligence," with the seaman's negligence reducing the award. *Sun Transp. Co.*, 900 F.2d at 1031 (7th Cir. 1990).

50. Similarly, as to unseaworthiness, "[c]ontributory negligence is not an absolute defense under maritime law, but rather it is a basis to apportion damage." *Fasold v. Del. River & Bay Auth.*, 117 F. App'x 836, 838 (3d Cir. 2004) (unpublished) (citing *Welch*, 377 F.2d at 504); *see also Socony-Vacuum Oil Co. v. Smith*, 305

U.S. 424, 428–29 (1939) ("Before the Jones Act a seaman was entitled to recover . . . indemnity for injuries due to an unseaworthy vessel" and "[c]ontributory negligence . . . was not a defense in suits . . . but was ground only for mitigation of damages."); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 199 n.37 (3d Cir. 1995) (explaining how "comparative negligence" is not a strictly proper term for unseaworthiness claims given that unseaworthiness imposes liability without fault regardless of whether the defendant was negligent but that the principles of "comparative causation" or "comparative responsibility" are "mostly indistinguishable" from comparative negligence).

51.    The evidence in this case establishes that Thurby did not act as a reasonable seaman would have on January 2, 2020.  By laying on the barge and using his left hand to reach for the O-ring, which was several feet below the barge's deck, physical injury was reasonably foreseeable.

52.    Thurby's negligence was also a contributing cause of the accident because his hand would not have been crushed if he stayed standing and had used the available kevel.

53.    A few factors militate against finding Thurby overwhelmingly at fault.  First, both Captain Thurman, an experienced seaman, and Thurby agreed Thurby would grab the lower ring.  (*See* FF No. 78).  Second, Captain Thurman's negligence in striking the dock was the direct cause of Thurby's injury.  Third, the barge approached the dock much faster than usual which limited the amount of time Thurby had to reflect on his chosen course of action.  At the same time, Thurby

had to tie the barge off or the vessel would miss the dock. And fourth, both Captain Thurman and Thurby had to take on additional tasks (Captain Thurman had to watch Thurby and Thurby had to call out distances), which impeded their ability to critically evaluate their course of action.

54.    The court finds *Gish v. CSX Transp., Inc.* to be similar, in principle, to this case. 890 F.2d 989 (7th Cir. 1989). There, the Seventh Circuit affirmed a jury's apportioning of 50/50 liability under FELA where a railroad worker injured himself attempting to lift a manhole cover that was ordinarily lifted by two men. *Id.* at 990; *see also Sobieski*, 413 F.3d at 631 ("FELA caselaw is broadly applicable in the Jones Act context."). The Seventh Circuit explained the railroad worker had contributed to his injury because he had added new dangers to the task by attempting to lift the cover by himself without specialized equipment. *Id.* at 992. Even still, because "the railroad negligently allowed the defective drainage system to continue without proper repair," it could not escape liability as "the company's negligence required [the worker] to remove the manhole cover" in the first instance. *Id.*

55.    Put differently, "[c]ontributory negligence . . . is a careless act or omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist." *Taylor v. Burlington N. R.R.*, 787 F.2d 1309 (9th Cir. 1986) (cited with approval by *Gish*, 890 F.2d at 991).

56.    Evansville Marine's actions created unreasonable conditions for Thurby to perform his duties as a deckhand. As previously discussed, the barge was forced to

approach downstream in quick conditions which lessened both Captain Thurman's and Thurby's reaction and decision-making time. Captain Thurman also garners some responsibility as it was his negligence that caused the barge to strike the dock with such force that it shook. It was, thus, foreseeable that Thurby could be injured by, for example, falling overboard while attempting to tie off to the kevel given the force at which the barge impacted the dock. By laying on his stomach, Thurby mitigated those risks and added others, such as the likelihood of having his left hand caught between the O-ring and dock. Thurby's added risks ultimately played a role in his injury, which makes him contributorily at fault. And contrary to Evansville Marine's suggestion, Evansville Marine negligently created the conditions which contributed to Thurby's poor decision making, as well as Captain Thurman's negligence in hitting the dock.

57. Based on the parties' roles giving rise to Thurby's injuries, the court concludes Thurby was 40% at fault for his injuries and is entitled to recover 60% of his damages from Evansville Marine.

**E.    Damages**

58. Thurby is entitled to the damages he has shown by a preponderance of the evidence, "even if [he] has not demanded that relief in [his] pleadings." Fed. R. Civ. P. 54(c).

59. The court notes Thurby has shown damages in the form of lost earnings, lost earning capacity, future medical costs, future prosthesis costs, past pain and suffering, and future pain and suffering. *See also* 1 Thomas J. Schoenbaum,

41

*Admiralty & Maritime Law*, § 4–10 Damages (explaining damages in admiralty principally consist of "past and future medical expenses; loss of earnings and loss of future earning capacity; and pain, suffering, and mental anguish).

60.    Thurby is also entitled to pre-judgment interest for both the unseaworthiness and Jones Act claims because he filed his claims in admiralty under Federal Rule of Civil Procedure 9(h).  *See Cent. Rivers Towing, Inc. v. City of Beardstown, Ill.*, 750 F.2d 565, 574 (7th Cir. 1984); *see also Brister*, 946 F.2d at 362 ("As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled.") (quoting *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980)); *see also Williams v. Reading and Bates Drilling Co*, 750 F.2d 487 (5th Cir. 1985) (allowing prejudgment interest to a Jones Act case brought under the court's admiralty jurisdiction, even without a finding of unseaworthiness).  *But see Theriot v. J. Ray McDermott*, 742 F.2d 877, 883 (5th Cir. 1984) (explaining it "is well settled that in an action *at law* under the Jones Act, the recovery of prejudgment interest is not permitted") (emphasis added); *cf. Pittman v. Port Allen Marine Servs.*, 794 F. Supp. 593, 596 (M.D. La. 1992) (discussing important distinctions between an action "filed at law" and those filed "in admiralty").

61.    Thurby argues he is entitled separate damages for disability and disfigurement. The court does not agree because these injuries are compensated through pain and suffering and through the calculation for lost earning capacity.  In the related

context of the Longshore and Harbor Workers' Compensation Act, the Supreme

Court explained that "[d]isability is a measure of earning capacity lost as a result

of work-related injury" and that this "is not necessarily reflected in actual wages

earned after injury." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 127 (1997).

To the extent that Thurby requests disability and disfigurement for the disruption

to his non-work-related life, most courts consider these harms "as an obvious

source of pain, suffering and mental anguish." *Blevins v. United States*, 769 F.2d

175, 179 (4th Cir. 1985); *Drayton v. Jiffee Chem. Corp.*, 395 F. Supp. 1081, 1097

(N.D. Ohio 1975) (awarding $500,000 for pain and suffering because "[t]he extent

and severity of [plaintiff's] disfigurement cannot be overstated").  This court does

the same.

62.    Finally, Thurby is not entitled to double recovery on his Jones Act and

unseaworthiness claims.  *The Dutra Grp.*, 139 S. Ct. at 2282.  But regardless of

which claim Thurby elects to recover under, his measure of damages is the same.

Both claims allow prejudgment interest in this scenario, and both doctrines

mitigate Thurby's recovery by his own contributory fault.

### 1.    Lost Earnings

63.    The parties submit dueling economics expert reports on Thurby's lost earnings.

The court finds that both Evansville Marine's expert, Dr. William Baldwin, and

Thurby's expert, Dr. Karen Tabak, are qualified and meet the requirements set out

in Rule 702.  (*See* Filing No. 131-4, Dr. Karen Grossman Tabak CV

(demonstrating sufficient education and experience in economics); *see also* Filing No. 131-11, Dr. William Baldwin CV (demonstrating the same)).

64. The court finds Dr. Baldwin, rather than Dr. Tabak, adequately accounts for the losses Thurby incurred from the date of the injury to trial because Dr. Tabak underestimated the advanced wages paid to Thurby and excluded a year of fringe benefits from her calculations.

65. Per Dr. Baldwin's calculations, the court concludes Thurby lost $55,027 in earnings from the date of injury to trial. (*See* Filing No. 131-13, Dr. Baldwin Report at 14). To determine that value, Dr. Baldwin took the earnings Thurby would have made had he been able to work in the interim period and subtracted the money he did make over that period (i.e., $66,119.82 in advanced wages plus his fringe benefits).

66. Given that Thurby can recover 60% of his losses, he is entitled to $33,016.20 in lost earnings.

67. The court rejects Evansville Marine's contention that it is entitled to a set off of $66,119.82 because it paid that amount to Thurby in advanced wages, even though he was not working. Those payments were already factored into Thurby's lost earnings. (CL No. 65).

## 2. Past Pain and Suffering

68. In determining the amount of past pain and suffering, the court "should be required as part of [its] Rule 52(a) obligation to set forth in [its] opinion the damages awards that [it] considered comparable." *Zhao v. United States*, 963 F.3d

692, 700 (7th Cir. 2020) (quoting *Jutzi-Johnson v. United States*, 263 F.3d 753, 759 (7th Cir. 2001)).[6]

69.    In *Kiwia v. M/V Oslo Bulk 9*, a court awarded $950,000 for past and future pain and suffering, permanent disability, disfigurement, mental anguish, and embarrassment after a hatch cover landed on and crushed a deckhand's hand.  541 F. Supp. 3d 696, 711 (E.D. La. 2021).  Like Thurby, that deckhand had a crush/avulsion injury and lost two fingers.  *Id.* at 704–05.

70.    Another similar case is *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421 (5th Cir. 1988).  There, a 57-year-old deckhand suffered severe injuries that nearly severed his foot after he fell to the deck of a vessel.  *Id.* at 1424.  While the foot was eventually saved, the deckhand's foot hurt constantly, he had to walk with a cane for the rest of his life, could only go short distances before painful swelling occurred in his foot, and he became gloomy and depressed.  *Id.*  The Fifth Circuit explained that "$600,000 is the maximum reasonable damages figure for . . . pain and suffering" based on the evidence.  *Id.* at 1427.  That amounts to an award of $1,551,877.31 in today's dollars.[7]

---

[6] The parties have not produced any comparable cases to support their damages calculations. Thurby requests $7,500,000 in pain and suffering, while Evansville Marine ignores pain and suffering entirely.

[7] The court utilized the Consumer Price Index Inflation Calculator published by the United States Bureau of Labor Statistics for this calculation and used September 2023 as the target date (the most recent month with inflation data available).  *See CPI Inflation Calculator*, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm (last visited October 19, 2023).

71.    In *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927 (5th Cir. 1982), the Fifth Circuit affirmed an award for $500,000 ($1,621,649.10 in today's dollars) in damages for pain and suffering. *Id.* at 934–35; *see also Simeon*, 852 F.2d at 1427 n.7 (explaining about $500,000 of the $600,000 award was for pain and suffering). There, a plaintiff suffered a broken arm, a fractured and dislocated wrist, and some other injuries following an auto accident that left him with a total physical impairment of 45%. *Shows*, 671 F.2d at 934.

72.    In *Golden v. OSG Ship Mgt., Inc.*, the Southern District of New York awarded $500,000 for past pain and suffering and $1,500,000 for future pain and suffering for a significant shoulder injury in a Jones Act case which left the plaintiff in an impaired state for another 51 years. 14-CV-06636, 2018 WL 9945199, at *6 (S.D.N.Y. Mar. 12, 2018).

73.    Finally, in *Wallace v. Borg-Warner Corp.*, 848 F.2d 195, 1988 WL 54125 (6th Cir. 1988) (unpublished), the Sixth Circuit affirmed a jury award of $500,000 ($1,309,740.43 in today's dollars) for a crushed hand where a punch press landed on the plaintiff's hand as she operated it. *Id.* at *1. The court explained this award was supported because the evidence showed the plaintiff: (1) suffered terrible pain when her hand was crushed, (2) required extensive medical treatment and therapy required post-injury, and (3) suffered permanent disfigurement. *Id.* at *4.

74.    Considering these similar cases, the pain of Thurby's injury and reparative operations, the suffering and pain of watching his fingers decay on his body, the total physical impairment of 25% from the injury, and the continuing pain he will

46

experience for around 45 years, the court finds the appropriate compensation for pain and suffering to be $1,500,000.

75.   Of that, the court apportions 40% for compensating Thurby's past pain and suffering.

76.   Accordingly, Thurby suffered past pain and suffering in the amount of $600,000.

77.   Thurby is entitled to recover 60% of that value, or $360,000.

### 3.    Prejudgment Interest

78.   The Supreme Court has consistently explained that "prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195 (1995) (citing *Cent. Rivers Towing*, 750 F.2d at 574 with approval).

79.   Thus, while the "allowance of interest on damages is not an absolute right," only certain, narrow circumstances justify denying that interest. *Cement Div.*, 515 U.S. at 195; *see also The Maggie J. Smith*, 123 U.S. 349, 156 (1887).

80.   Prejudgment interest may only accrue on past, not future, damages. *Brister*, 946 F.2d at 362.

81.   Additionally, the court possesses broad discretion in determining what rate of interest to apply. *United States v. Peavey Barge Line*, 748 F.2d 395, 402 (7th Cir. 1984) (citing *Ind. Bulk Transp., Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23, 25 (2d Cir. 1982)).

82.    The Seventh Circuit has instructed courts to utilize the prime rate[8] to calculate

prejudgment interest.  *Amoco Cadiz*, 954 F.2d at 1332.

83.    But rather than look to the prime rate at the end of the case, the court must

determine the average prevailing prime rate during litigation.  *See Amoco Cadiz*,

954 F.2d at 1335 (concluding averaging prime rate over the course of litigation

was appropriate).

84.    Additionally, interest should accrue from the date of the collision in admiralty

cases.  *See, e.g.*, *The Manitoba* 122 U.S. 97, 101 (1887) (describing, in dicta, that

interest should run "from the date of the collision to the date of the decree"); *see*

*also Cement Div.*, 515 U.S. at 195 n.6 (citing *The Manitoba* with approval).  The

court sees no reason to depart from that general principle here.

85.    The weighted average prime rate from January 2, 2020, to the date of judgment is

4.767%.[9]

86.    Therefore, the court awards Thurby prejudgment interest of 4.767% on his past

damages of $393,016.20 beginning on the incident date to the date of judgment

with compounding interest annually, totaling $75,303.07.

---

[8] The prime rate is the lowest rate of interest at which money can be borrowed by commercial entities.  As such, the prime rate "closely approximates" a commercial entity's "costs of borrowing."  *Cent. Rivers*, 750 F.2d at 574.

[9] The court takes judicial notice of the prevailing prime rates as reported by the Federal Reserve of St. Louis pursuant to Federal Rule of Evidence 201 for the period between January 2, 2020, and the date of judgment.  *See Bank Prime Loan Rate Changes: Historical Dates of Changes and Rates*, Federal Reserve Economic Data, https://fred.stlouisfed.org/series/DPRIME (last visited October 20, 2023).  Additionally, this average was calculated by weighting how long each prime rate prevailed to simulate borrowing conditions each day following the incident.

### 4.    Lost Earning Capacity

87.    A seaman can recover for the loss of prospective earnings and for impairments to his future earning capacity.  Schoenbaum, *Admiralty & Maritime Law*, § 4–10(2).

88.    This is partially a measure of his disability—that is, what opportunities Thurby proves to a reasonable certainty he would have had had he not been injured.  *See, e.g.*, *Zhao*, 963 at 697–98 (discussing lost earnings as a measure of the plaintiff's "earning potential," rather than just the plaintiff's actual earnings).

89.    This determination is made upon Thurby's showing by a preponderance of the evidence that "his injuries have narrowed the range of economic opportunities available to him."  *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir. 1992).  In other words, the focus is on whether his earning power has been diminished, not on what he would have made.  *Id*

90.    This is "a nonpecuniary injury."  *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1997).

91.    In measuring this nonpecuniary harm, the court must discount the award by the probability the plaintiff would have lived up to his economic promise had he not been injured.  *See O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1200 (7th Cir. 1982).

92.    Determining the likelihood a plaintiff would have achieved their economic potential is left to the prudence, experience, and insight of a reasonable factfinder.  *Gorniak v. National R.R. Passenger Corp.*, 889 F.2d 481, 484 (3d Cir. 1989) (explaining there is "a preference for leaving the resolution of any uncertainty

about whether such circumstances will come to pass to a properly instructed

jury").

93. Thurby has shown, by a preponderance of the evidence, that his hand injury has

limited his economic horizons because he has shown his hand injury substantially

impairs him and prevents him from continuing his career as a deckhand. (*See* FF

Nos. 124–29).

94. Thurby has also shown the injury has narrowed his economic opportunities by

preventing him from being able to advance from his deckhand position to other,

related positions like a mate or pilot on a barge. (*See* FF Nos. 124–29). First, he

shows by a preponderance of the evidence that a career path to pilot reasonably

would have been available to him. The following findings support that

conclusion:

a.    Thurby indicated he wanted to be a pilot and make a career on the river.

(Tr. at 167). He testified that being "a traveling pilot . . . would be an

interesting job for me." (*Id.*).

b.    Thurby dreamed of being a river boat pilot since he began working as a

deckhand based on his experience with Mt. Vernon Barge and from hearing

about a family member's experience on the river. (Tr. at 167–68).

c.    The evidence also establishes that many pilots started their careers as

deckhands. All captains present in the case began as deckhands before

receiving their pilot's license.

d. For example, Captain Thurman worked as a deckhand for four and a half years before receiving his pilot's license and becoming a pilot. (Tr. at 236–37; *see also* Filing No. 73-3 Captain Thurman Dep. at 10–11).

e. Captain Hensley, the liability expert for Thurby, began as a deckhand for around five years before getting his pilot's license and moving up to pilot. (Tr. at 61; *see also* Thurby Ex. 48, Hensley CV).

f. Finally, Dakota Shreve—a deckhand for Evansville Marine and mentor to Thurby—was putting in hours to get his pilot's license to become a pilot for Evansville Marine. (Tr. at 137–38).

g. All this demonstrates to a reasonable certainty that Thurby had the opportunity to be a pilot.

95. Evansville Marine's alternate conclusion—that Thurby had no economic opportunity other than to be a deckhand for another 42 years with no concomitant increase in salary—is rejected; no evidence or logic supports the idea that there are career deckhands that never make more than their starting salary. *Cf. Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 535 (1983) ("With the passage of time, an individual worker often becomes more valuable to his employer. His personal work experiences increase his hourly contributions to firm profits. To reflect that heightened value, he will often receive 'seniority' or 'experience' raises, 'merit' raises, or even promotions."). Neither party spends much time discussing the position of mate, but Thurby has shown, to a reasonable certainty, that he had

the opportunity to be a mate because it is an intermediate position between pilot and deckhand.

96. Second, Thurby has shown these career paths are no longer open to him because of the injury due to his medical restrictions and his overall 25% impairment rating. (FF Nos. 124–29). This locked Thurby out of the career paths to being a mate or pilot because he is no longer continuing as a deckhand.

97. However, given the lack of concrete steps Thurby has taken to become a pilot and that many deckhands presumably do not become pilots, the court finds only a 10% probability that Thurby would have taken this opportunity.[10] It is more likely that Thurby would advance to a mate position after 5 years as a deckhand in recognition of his seniority and experience. In sum, the court finds a 10% probability that Thurby would have advanced to the position of pilot, an 80% probability Thurby would have advanced to the position of mate after 5 years as a deckhand and remained in that role, and a 10% probability he would have remained a deckhand for his whole career.

98. Dr. Tabak's economic analysis most closely tracks this measure of Thurby's damages. (*See* Thurby Ex. 51b at P-TABAK000101).

---

[10] Recall that the court is not awarding an independent amount of damages for disability because lost earning capacity partially measures of disability (what Thurby reasonably had the opportunity to do). *See Rambo*, 521 U.S. at 127 (explaining lost earning capacity is "not necessarily reflected in actual wages earned after injury."). It is the province of the factfinder—in the same way it might be to determine comparative percentages of liability—to weigh the evidence and determine what is too speculative and what gives short shrift to potential lost opportunities. *See Gorniak*, 889 F.2d at 484. The values in this paragraph adequately strike that balance. *See Rambo*, 521 U.S. at 133 (explaining determining lost earning capacity relies on the factfinder to use their judgment).

99.   She opines that Thurby would have suffered $514,088 in lost earning capacity should he have remained a deckhand for the rest of his 42-year career, $1,088,518 in lost earning capacity if Thurby became a mate after 5 years of service as a deckhand, and $1,868,747 in lost earning capacity if Thurby became a pilot after 5 years of service as a mate.  (Thurby Ex. 51b at P-TABAK000101).

100.  After accounting for the above percentages, Thurby's ability to maintain full-time employment at $14.50 an hour, and for the time value of money, the court finds Thurby lost $1,187,120.80 in earning capacity from the date of trial until he planned to retire at 62.

101.  Evansville Marine attacks Dr. Tabak's analysis on multiple grounds, the first being that Dr. Tabak used the median salary of a deckhand in the national economy rather than Thurby's actual salary from Evansville Marine.  Thurby's actual annualized salary is lower than the median salary by $1,575 per year.  The court does not agree using the median salary was an error.

102.  In determining Thurby's lost earning capacity, the court calculates the difference between his earning *potential* before injury and his earning *potential* after injury. *Zhao*, 963 F.3d at 697.

103.  An analysis for lost earning capacity necessarily includes considering "[e]nvironmental factors such as *the condition of the labor market*, the chance of advancement or of being laid off, and the like."  4 F. Harper, F. James, & O. Gray, Law of Torts § 25.8, 550–51 (2d ed. 1986) (footnote omitted) (emphasis added) (cited with approval by *Rambo*, 521 U.S. at 132).

104.  Had Thurby not been injured, he would have remained, at least in the short term, a deckhand at Evansville Marine.[11]  Evansville Marine argues the important fact is that Thurby would have been employed by Evansville Marine.  But Thurby's *potential* is represented by what he could make as a *deckhand*, not necessarily as an Evansville Marine employee, because Evansville Marine offers a salary on the low end of the range that deckhands make and Thurby reasonably could have made more in the open market.  In other words, the amount Thurby had the opportunity to earn but for his injury is best represented by the amount *the market* values the services Thurby would have provided.  *See* Restatement (Second) of Torts § 924, Comment *d*, p. 525 (1977) (explaining lost earning potential is "the difference . . . between the value of the plaintiff's services as they will be in view of the harm and as they would have been had there been no harm") (emphasis added) (cited with approval by *Rambo*, 521 U.S. at 132).

105.  Evansville Marine rejoins that any such calculation is speculative as there is no evidence that Thurby would have taken a deckhand position at the median salary.  Yet "to determine lost wage-earning capacity, [the factfinder] must often 'use their judgment (in effect, . . . speculate).'"  *Rambo*, 521 U.S. at 133 (quoting Law of Torts § 25.8 at 553).  State laws apply essentially the same approach, which recognizes that predicting lost earning capacity—especially for one who has only

---

[11] Thurby did indicate he would remain at Evansville Marine so long as they offered him advancement opportunities to become a pilot.  Given that Evansville Marine argues Thurby would not have advanced to pilot, it is reasonably likely Thurby would have sought a position in the open market.

just begun or has yet to begin their career—is an inherently speculative endeavor and does not require strict proof that the plaintiff *would* have taken up the median position, only that they *could* have.  *See, e.g.*, *Zhao*, 963 F.3d at 698 (applying Illinois law and explaining state law "requires primarily that *the permanence of the injury itself* be proved to reasonable certainty, but . . . recognizes the inherent but unavoidable uncertainty in any calculation of lost earnings") (emphasis in original).  It was not an error for Dr. Tabak to measure Thurby's lost earning potential by reference to the value the market placed on the services Thurby could have provided but for his injuries.

106.   In any event, Dr. Tabak's usage of the market value for Thurby's services does not significantly change the analysis as it only results in a difference of $4,449.98, at present value, over Thurby's remaining 42 years of work life (or $105 a year).  *See Pfeifer*, 462 U.S. at 552 (explaining the difficulties with exactly projecting a lost future stream of income, such that even "the most detailed inquiry can at best produce an approximate result" and trial judges should not "embark on a search for 'delusive exactness.'") (quoting *Feldman v. Allegheny Airlines, Inc.*, 524 F.2d 384, 392 (2d Cir. 1975) (Friendly, J., concurring *dubitante*)).

107.   Evansville Marine also argues Dr. Tabak's report contains vocational testimony on which Dr. Tabak is not qualified to opine.  It specifically takes issue with her assumption that Thurby would become a mate or a pilot and her assumption that Thurby would work until he was 62.  But Dr. Tabak is not opining whether these career paths were available to Thurby, rather she is opining on Thurby's lost

earnings if other evidence establishes those facts are reasonably certain.  (*See* Filing No. 116, Court's Entry rejecting this argument).  And the conclusion these career paths were, but are no longer, open to Thurby *is* based on the other evidence submitted, namely Thurby's direct testimony and the evidence about the career progression of other seamen present in the case.  Of course there are many variables that factor into lost earning capacity such that the lost income stream "cannot be known with certainty," but the inquiry here is only to produce "an approximate result" of the money lost.  *Pfeifer*, 462 U.S. at 534; *id.* at 554.  Thus, the court rejects this argument.

108.    Evansville Marine also contends Dr. Tabak erred by calculating Thurby's future earning capacity from his gross pay (pre-tax) rather than his net pay (post-tax).  As a result, Evansville Marine believes that subtracting income taxes from Tabak's calculation remedies this error.  This argument is correct insofar as Dr. Tabak should have removed taxes from Thurby's future earning capacity, but not correct that removing income taxes shows the correct result of Thurby's lost earning potential.  *See Pfeifer*, 462 U.S. at 534 (explaining that in a personal injury case "the relevant stream is ideally of *after-tax* wages and benefits").

109.    Thurby's projected future earning capacity also needs to be increased to account for the taxes Thurby needs to pay on the interest a lump sum payment generates over time (which would not be offset by the taxes Thurby would have paid if he had received the money).  *See O'Shea*, 677 F.2d at ("[T]he economist should not have deducted [plaintiff's] *entire* income tax liability in estimating her future lost

wages.  While it is true that the damage award is not taxable, the interest [plaintiff] earns on it will be, . . . so that [the economist's] method involved an element of double taxation.") (citation omitted) (emphasis added).  As such, the lump sum needs to be increased to account for the taxes on interest; otherwise, Thurby will be left undercompensated.  *Oddi v. Ayco Corp.*, 947 F.2d 257, 267 n.6 (7th Cir. 1991); *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1033–34 (5th Cir. 1984); *De Lucca v. United States*, 670 F.2d 843, 845 (9th Cir. 1982).

110.    A net decrease of Dr. Tabak's report by 2% accurately captures the balance of these two errors.  This includes a four percent downward departure to account for Thurby's after-tax earnings.  (*See* Thurby Ex. 51b at P-TABAK000103 (explaining Dr. Tabak's analysis would be affected by less than four percent should income taxes be considered)).  The court then includes a two percent upward departure to account for the effect of taxes on the interest Thurby would receive on the lump sum.

111.    After accounting for the effect of taxes, the present value of Thurby's lost earning capacity is $1,086,915.94.

112.    Thurby is entitled to recover 60% of that amount, or $652,149.56.

### 5.    Future Medical Costs

113.    Awarding future medical costs is proper where the plaintiff shows to a reasonable degree of certainty they will be forced to incur these medical costs due to their injury.  *See* Schoenbaum, *Admiralty & Maritime Law*, § 4–10(3) ("Recovery of future medical expenses will depend on adequate proof of their cost and necessity.

Medical monitoring expenses will be denied if they are speculative in nature.")
(footnote omitted).

114. In *DeSantis v. Parker Feeders, Inc.*, 547 F.2d 357 (7th Cir. 1976), the Seventh
Circuit upheld an award of $40,000 for future medical expenses. *DeSantis*, 547
F.2d at 366. That plaintiff suffered an injury that required a prosthesis. *Id.* The
Seventh Circuit found the award to be reasonably certain due to the permanency of
the injury, the plaintiff's life expectancy, and testimony from the prosthetist
regarding the frequency of prosthesis the plaintiff would need to purchase. *Id.*

115. Under admiralty law, the Eastern District of New York awarded future medical
expenses where the plaintiff's doctor testified to the plaintiff requiring additional
medical treatment in the form of surgeries following a hand injury. *Podgurski v.
Town of N. Hempstead*, 824 F. Supp. 2d 358 (E.D.N.Y. 2011).

116. The Southern District of Alabama similarly granted damages for future medical
expenses of $200 per month in an admiralty action where a plaintiff fell off a
ladder. *Purdy v. Belcher Refining Co.*, 781 F. Supp. 1559, 1562 (S.D. Ala. 1992).
That court awarded those costs based on the plaintiff's treating doctor testifying
that, even though Plaintiff reached "maximum medical recovery," he would still
need to receive pain management treatment from the doctor for the rest of his life.
*Id.*

117. Here, the evidence shows Thurby visits his treating mental health professional
once every three months, his aggravated mental conditions will be present for the

rest of his life, and he will need to continue to return to Stanishia at the price of $260 per visit.

118. This is sufficient to state to a reasonable certainty, similarly to *Purdy*, that Thurby will suffer medical costs of $260 every three months for the remaining 45.1 years of his life.

119. Considering Thurby will receive a lump sum for these damages, the court will account for the present value of these cash flows. *See Monessen S.W. Ry. v. Morgan*, 486 U.S. 330, 339 (1988).

120. The court selects a quarterly periodic rate equal to .6% APY (.4987% per quarter) as the discount rate which represents the average yield on United States government bonds less increases to the cost of medical care as predicted by the Economic Report of the President and accords with the discount rate Dr. Tabak used to calculate future prosthesis costs.

121. Applying that discount rate to cash flows of $260 every three months for 45.1 years yields a present value of $30,995.52 for future medical costs.

122. Of that, Thurby is entitled to recover 60%, or $18,597.31.[12]

**6.    Future Prosthetic Costs**

123. Thurby has also shown to a reasonable degree of certainty that he will need to repair and replace his prosthesis, which he will wear for the rest of his life.

---

[12] Thurby failed to specifically request this cost in his proposed findings of fact and conclusions of law, but he did request future medical costs at trial.  (Tr. at 365 ("Judge, under the Jones Act we have a future medical cost claim.")).  Regardless, Rule 54(c) requires the court to grant the relief to which Thurby is entitled, even if he fails to request that relief.  *See* Fed. R. Civ. P. 54(c).

124. Thurby established this through Kimsey's testimony and documentary evidence demonstrating the average life of a prosthesis lasts 3–5 years with maintenance costs being about 5% of the prosthetic's overall cost through that time period.

125. Awarding future costs for the maintenance and repair of a prosthesis worn for life is ordinary and measured by the cost of the prosthesis. *See DeSantis*, 547 F.2d at 366.

126. The court adopts Dr. Tabak's report on the present value of the costs of the prosthesis and finds no issue with Dr. Tabak's assumed prosthetic life of four years (naturally some devices will tend toward five years while some tend toward three).

127. Therefore, the present value of Thurby's future prosthetic costs is $288,166.96. (*See* Filing No. 144).

128. Of this, Thurby is entitled to recover 60%, or $172,900.18.

### 7.    Future Pain and Suffering

129. Per the court's previous conclusion, Thurby suffered $1,500,000 in pain and suffering.  (CL No. 74).

130. This sum is supported by the same cases discussed above.

131. Given that $600,000 of that was for past pain and suffering, $900,000 is the total for future pain and suffering.

132. Accordingly, Thurby is entitled to 60%, or $540,000 for future pain and suffering.

### CONCLUSION

Pursuant to these findings of fact and conclusions of law, the court will enter judgment in favor of Thurby and against Evansville Marine on Evansville Marine's

Petition for Exoneration or Limitation (Filing No. 1).  Further, the court will enter

judgment in favor of Thurby and against Evansville Marine on Thurby's counterclaims of

Jones Act Negligence and Unseaworthiness under Maritime Law (Filing No. 14).  The

court also **ORDERS** Evansville Marine to pay Thurby $1,851,966.32 for the damages

arising from these successful claims.  That measure includes:

1.  $33,016.20 of past lost earnings;

2.  $360,000.00 for past pain and suffering;

3.  $75,303.07 in prejudgment interest;

4.  $652,149.56 for future lost earning capacity;

5.  $18,597.31 for future medical costs;

6.  $172,900.18 for future prosthesis costs; and

7.  $540,000.00 for future pain and suffering.

Finally, the parties are **ORDERED** to submit statements of position in the companion

case, *Thurby v. Evansville Marine Service, Inc.*, No. 3:20-cv-104, given the disposition of

this case by **November 3, 2023**.

**IT IS SO ORDERED** this 20th day of October 2023.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsels of Record.